| | | |
|---|---|---|
| FRANK MUCERINO III and<br>CREEKSIDE TERRACE LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:21-cv-00284 |
| | ) | Judge Aleta A. Trauger |
| CHARLES JOSHUA DALE MARTIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Charles Joshua Dale Martin has filed three motions seeking the dismissal of the claims against him: a Petition to Dismiss Pursuant to the Tennessee Public Participation Act (Doc. No. 13); a Rule 12(b)(1) Motion to Dismiss (Doc. No. 21); and a Rule 12(b)(6) Motion to Dismiss (Doc. No. 23). Defendants Frank Mucerino III and Creekside Terrace, LLC ("Creekside") have filed a Response to each of the latter two motions (Doc. Nos. 29, 30), and Martin has filed Replies (Doc. Nos. 31, 32.) With regard to the first motion, Mucerino and Creekside have, in lieu of a response, filed a Motion to Strike (Doc. No. 18), to which Martin has filed a Response (Doc. No. 25), and Mucerino and Creekside have filed a Reply (Doc. No. 27). For the reasons set out herein, the Motion to Strike and the Rule 12(b)(6) Motion will be granted, and the other motions will be denied.

## I. BACKGROUND

### A. The Plaintiffs' Allegations[1]

---

[1] Unless otherwise indicated, these facts are from the Complaint (Doc. No. 1) and are taken as true for the purposes of the non-jurisdictional motions to dismiss.

On March 22, 2021, Martin posted the following message to a Facebook group called the "Residents of Camp Ravine Estates & Cottages at Sycamore Ridge":

> Hey neighbors, I'm sure all of you are aware that there are many unresolved issues with our neighborhood that the developer is responsible for, but we know he has no plans to fix them and is now reportedly moving away.
>
> It seems to me the advice of the city attorney to lawyer up will be a waste of time and money especially if Frank the developer claims bankruptcy.
>
> In my opinion, the best course of action would be to schedule a time on the City Hall agenda to have our case heard with all of the problems the engineer has noted that Karla Cobbs has posted here previously. This will require everyone to participate, attend, and compile evidence of the issues caused by the developer.
>
> Please let me know your thoughts.

(Doc. No. 1 ¶ 3; Doc. No. 1-1.[2]) "Frank the developer" referred to Frank Mucerino, who developed Martin's neighborhood of Camp Ravine Estates ("Camp Ravine") through Creekside, which Mucerino owns. (Doc. No. 1 ¶ 9.) Mucerino claims that he "is not responsible for any of the unresolved 'issues' . . . Martin mentions" and "has no intention of claiming bankruptcy." (*Id.* ¶¶ 16–18.) Mucerino claims that the text of Martin's Facebook post "has been read by members of the public and unjustly damaged . . . Mucerino's reputation," causing Mucerino to suffer "economic losses, . . . humiliation, and emotional distress." (*Id.* ¶ 26.)

On April 7, 2021, Mucerino and Creekside filed a Complaint in this court against Martin based on the post. (*Id.*) The plaintiffs assert four claims: Count I is for defamation of Mucerino; Count II is for false light invasion of Mucerino's privacy; Count III is for defamation of Mucerino "by implication"; and Count IV is for defamation of Creekside. (*Id.* ¶¶ 22–41.) The plaintiffs collectively seek compensatory damages in excess of $100,000 and punitive damages in excess of

---

[2] The court has taken the full name of the Facebook group, which is truncated in the screenshot included with the Complaint, from the briefing, but it appears to be undisputed.

$200,000. (*Id.* at 8.) Martin has asked the court to dismiss the claims, either as meritless or because the court lacks jurisdiction over this dispute.

## B. Facts Related to Jurisdiction

"Federal courts are courts of limited jurisdiction," meaning that "[t]hey possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) (citations omitted). Based on that principle, it is initially "presumed that a cause lies outside [the federal courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citations omitted). Although many cases clear that bar based on the fact that the underlying causes of action arise under federal law, the court also has jurisdiction to consider claims, regardless of their legal provenance, filed by a citizen of one state solely against citizens of other states. Specifically, under 28 U.S.C. § 1332, the court has so-called diversity jurisdiction over cases between "citizens of different States," so long as the "matter in controversy exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a)(1). The Complaint, which seeks an amount in excess of $75,000, asserts that Mucerino "is a citizen and resident of the State of Florida" and that the only other two members of the Creekside LLC—also members of the Mucerino family—are Florida residents as well, whereas Martin lives in Tennessee.[3] (Doc. No. 1 ¶¶ 4–6.)

Martin, however, draws the court's attention to facts that complicate that picture. Records from the Tennessee Secretary of State regarding Creekside and another Mucerino-owned company continue to list addresses in Burns, Tennessee for Mucerino. (Doc. No. 21-1 at 2, 4.) A copy of Mucerino's contractor licensure record from the Tennessee Department of Licensure and

---

[3] Under current caselaw, "a limited liability company . . . ha[s] the citizenship of each partner or member." *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009) (citing *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187–92 (1990)). "The state of organization . . . [is] legally irrelevant." *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (citing *Carden*, 494 U.S. at 192).

3

Insurance also includes only a Tennessee address. (Doc. No. 21-3.) Martin has provided depositions of Mucerino and his wife Sharon that include discussions of their move from Tennessee to Florida, and those depositions confirm that, even by the version of the facts most favorable to Mucerino, he moved to Florida *barely* in time for diversity jurisdiction to exist when he filed his claims on April 7, 2021. (Doc. Nos. 21-2, -4.)

By Mucerino's telling, he was born in and spent most of his life in Tennessee, but, in March of 2021, he "started moving to Florida," which included sending some of his personal property ahead to that state and putting other property in storage in Tennessee.(Doc. No. 21-2 at 18.) On March 31, 2021, he finalized the sale of his Tennessee residence, and he has testified that, after that date, he no longer kept any personal belongings at his former home or went to the home for any purpose other than to "go over some things" with the new owner. (*Id.* at 17–18.)

On a day no later than April 7, 2021, Mucerino purchased a home in Florida from his parents, where he has since been living while working as an independent contractor in that state.[4] (*Id.* at 8–10, 33.) Although Mucerino originally had difficulty, during his deposition, recalling whether he was physically in Florida on April 7 itself, because he was traveling back and forth often, he has filed a Declaration stating that he and his family were, in fact, in that state on that day. (Doc. No. 29-1 ¶ 8.) By Mucerino's admission, however, he had not, as of April 7, completed many of the logistical steps that typically accompany a move from one state to another. He still had a Tennessee driver's license and no Florida driver's license. His car registration was still in Tennessee. One of his children was continuing to attend virtual school based out of Tennessee and was not enrolled in Florida. (Doc. No. 21-2 at 26–27.) His personal bank account and the bank

---

[4] It appears that at least some of the paperwork related to the purchase was completed two days earlier, on April 5, 2021, although Mucerino himself characterizes April 7 as the purchase date. (See Doc. No. 24-2 at 18, 28–29.)

accounts of his businesses were held by banks in Tennessee. (Doc. No. 21-4 at 9.) The Mucerino family also took part in a Tennessee-based yard sale, run by multiple families in their old neighborhood, in mid-April, as a way of getting rid of items that they did not want to take to Florida. (*Id.* at 13.)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Although subject-matter jurisdiction is non-waivable and can be considered by the court at any time, Rule 12(b)(1) provides a formal mechanism for a defendant who wishes to contest subject-matter jurisdiction in a newly filed case. Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack under Rule 12(b)(1) "questions merely the sufficiency of the pleading," and the trial court therefore takes the allegations of the complaint as true. *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 816 (6th Cir. 2017) (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). A factual attack is a challenge to the factual existence of subject matter jurisdiction. In the case of a factual challenge, no presumption of truthfulness applies to the factual allegations. *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015).

When a Rule 12(b)(1) motion contests jurisdiction factually, as Martin's does, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Genetek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007); *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). When the facts are disputed in this way, "[t]he district court has broad

discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary," without converting the motion into one for summary judgment. *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992*), aff'd sub nom. Myers v. United States*, 17 F.3d 890 (6th Cir. 1994); *see also Genetek*, 491 F.3d at 330. It is then the plaintiff's burden to show that jurisdiction is appropriate. *DLX*, 381 F.3d at 511.

## B. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

6

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

### A. Jurisdiction

The only reasonable reading of the available evidence is that Mucerino and his family now live in Florida, while Martin lives in Tennessee. Diversity of citizenship, therefore, *currently* exists. The Supreme Court, however, has long held that diversity jurisdiction "is tested by the facts as they existed *when the action [was] brought*." *Smith v. Sperling*, 354 U.S. 91, 93 n.1 (1957) (emphasis added); *accord White v. United States*, 601 F.3d 545, 553 n.4 (6th Cir. 2010). While it may be clear that the Mucerinos have, by now, relocated to Florida, it is at least less clear whether they had done so when the plaintiffs filed their Complaint. The issue that determines whether this case was appropriately filed in this district, therefore, is *when*, for jurisdictional purposes, the Mucerinos' relocation occurred.

"Citizenship," in the context of diversity jurisdiction, "means domicile," and an individual party "can only have one domicile at a time." *Kendall v. DeLong*, No. 20-5573, 2020 WL 9813548, at *2 (6th Cir. Dec. 1, 2020) (quoting *Stifel v. Hopkins*, 477 F.2d 1116, 1120 (6th Cir. 1973)); *Persinger v. Extendicare Health Servs., Inc.*, 539 F. Supp. 2d 995, 996 (S.D. Ohio 2008) (citing *Eastman v. Univ. of Mich.*, 30 F.3d 670, 672 (6th Cir. 1994); *Von Dunser v. Aronoff*, 915 F.2d 1071, 1072 (6th Cir. 1990)). That premise—combined with the fact that every individual party must have *some* domicile—means that "[o]ne's previous domicile is not lost until a new one is acquired." *Bergenstein v. Sawhny*, No. 1:04 CV 1373, 2007 WL 963305, at *1 (N.D. Ohio Mar. 28, 2007) (citing *Von Dunser*, 915 F.2d at 1072.) The fact that Mucerino sold his Tennessee home

7

before he filed his Complaint, therefore, does not necessarily establish that he had ceased to be a Tennessee citizen for the purposes of this court's jurisdiction.

The constitutional and statutory grants of diversity jurisdiction, insofar as they provide any guidance to the courts at all, are mainly concerned with what diversity of citizenship is, not with how a court should treat the specific, presumably rare situation of a plaintiff's filing his claims right in the middle of his moving from one state to another. The court, accordingly, must consult the available caselaw for guidance in determining at what moment the Mucerinos of Tennessee became the Mucerinos of Florida. If it happened after April 7, 2021, the court must dismiss the claims; if it happened on or before that date, then the court can consider those claims on the merits.

"To acquire a domicile within a particular state, a person must be physically present in the state and must have either the intention to make his home there indefinitely or the absence of an intention to make his home elsewhere." *Kendall*, 2020 WL 9813548, at *2 (6th Cir. Dec. 1, 2020) (quoting *Stifel*, 477 F.2d at 1120) (emphasis omitted). "When a party's domicile is in doubt, courts must" take a "case-by-case approach" that considers the "totality of the circumstances, . . . weighing a variety of relevant factors." *Woods v. Keith Titus Corp.*, No. 3:12-CV-112, 2013 WL 3324062, at *3 (E.D. Tenn. July 1, 2013) (quoting *Ford Motor Co. v. Collins*, No. 11-15011, 2011 WL 5877216, at *2 (E.D. Mich. Nov. 23, 2011)). Among the factors considered by courts are:

> the party's current residence; voter registration and voting practices; situs of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs, and other associations; place of employment or business; driver's license and automobile registration; payment of taxes; as well as several other aspects of human life and activity.

*Id.* at *3 (quoting *Ford Motor Co.*, 2011 WL 5877216, at *2).

All of the available evidence suggests that, by the time this case was filed, Mucerino had developed the intention to remain in Florida as a resident. He sold his Tennessee home and emptied

8

it of his belongings, and he had begun moving those belongings to Florida, a state with which he already had family connections. He had, moreover, established a physical presence in Florida by buying a home. While the various formal records and licenses bearing a Tennessee address for Mucerino certainly provide *some* evidence in favor of concluding that Mucerino's domicile remained in Tennessee as of April 7, 2021, all of those records can be easily explained by the fact that Mucerino, like many individuals, was not perfectly efficient in terms of completing every task associated with his move ahead of time. The court ultimately must ask itself which of the two possible interpretations of events is more plausible: that Mucerino had moved to Florida by April 7 but had delayed in terms of updating all of the associated paperwork; or that Mucerino sold his home, purchased a new home, and moved his belongings, despite the fact that he had not yet developed an intent to live in the new state. In the court's view, the former explanation makes far more sense.

Martin, in essence, is asking the court to dismiss Mucerino's claims by concluding that, regardless of where Mucerino lives now, he had simply not checked enough boxes by April 7, 2021 to be considered a citizen of Florida. And there is nothing inherently wrong with such an argument; sometimes a court's jurisdiction really does hinge on minute, formal distinctions. The court, however, will only dismiss a case for failure to comply with technical requirements if the technical requirements at issue are *actually requirements*. Martin, however, has not identified any caselaw—let alone any statutory or constitutional provision—stating that the steps that Mucerino had failed to complete by April 7 were actual prerequisites for reestablishment of his domicile, as opposed to merely data points that the court should consider in the context of all of the other available information. To the contrary, the caselaw is effectively unanimous that the court must look to the totality of the circumstances. Mucerino's unfinished steps are merely pieces of evidence

to be considered, and the court finds that they are outweighed by the evidence suggesting that, as of April 7, 2021, Mucerino had, in fact, physically relocated to Florida and intended to remain there indefinitely. The court, accordingly, will not dismiss his claims for lack of jurisdiction.

## B. Application of Tennessee Public Participation Act

The Tennessee Public Participation Act ("TPPA") is Tennessee's version of what is widely known as an "anti-SLAPP statute"—"SLAPP" meaning, here, "strategic lawsuit against public participation." As the "anti-" in the description of the statute suggests, such lawsuits are strongly disfavored, because the punitive and chilling effects that they impose on public discourse typically far outweigh any benefits associated with allowing the underlying claims to proceed. Although anti-SLAPP statutes have existed for some time, Tennessee's TPPA itself "is a relatively new creature of the legislature, having only been codified in 2019" and, thus far, has only been interpreted by the courts in a relative handful of cases. *Doe v. Roe*, No. M2020-0127-7COA-R3-CV, 2021 WL 2588394, at *2 (Tenn. Ct. App. June 24, 2021). The statute is, at least generally speaking, "designed to 'encourage and safeguard the constitutional rights of persons to petition, to speak freely, to associate freely, and to participate in government to the fullest extent permitted by law and, at the same time, protect the rights of persons to file meritorious lawsuits for demonstrable injury.'" *Id.* (quoting Tenn. Code Ann. § 20-17-102).

The core feature of the TPPA is its creation of a unique procedural mechanism, distinct from an ordinary motion to dismiss for failure to state a claim, through which a defendant may seek an expeditious dismissal of the suit filed against him based on his participation in public discourse. The structure of that procedural mechanism is set forth in Tenn. Code Ann. § 20-17-104:

10

(a) If a legal action is filed in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may petition the court to dismiss the legal action.

(b) Such a petition may be filed within sixty (60) calendar days from the date of service of the legal action or, in the court's discretion, at any later time that the court deems proper.

(c) A response to the petition, including any opposing affidavits, may be served and filed by the opposing party no less than five (5) days before the hearing or, in the court's discretion, at any earlier time that the court deems proper.

(d) All discovery in the legal action is stayed upon the filing of a petition under this section. The stay of discovery remains in effect until the entry of an order ruling on the petition. The court may allow specified and limited discovery relevant to the petition upon a showing of good cause.

*Id.* When filing such a petition, "[t]he petitioning party has the burden of making a prima facie case that a legal action against the petitioning party is based on, relates to, or is in response to that party's exercise of the right to free speech, right to petition, or right of association." Tenn. Code Ann. § 20-17-105(a). Once the defendant makes out a prima facie case that he was exercising his First Amendment rights, however, the TPPA directs that "the court shall dismiss the legal action unless the responding party [the plaintiff] establishes a prima facie case for each essential element of the claim in the legal action." Tenn. Code Ann. § 20-17-105(a).

As well-intentioned as those provisions may be, their self-evidently procedural nature poses an obstacle to simply importing the TPPA in its unvarnished entirety into a case filed in federal court. The Federal Rules of Civil Procedure already set forth specific procedures pursuant to which a district court shall consider whether to dismiss a plaintiff's claims, and those procedures—mostly covered by Rule 12, until the Rule 56 summary judgment phase of the case— differ from the procedures set out in the TPPA. Particularly stark is the difference in the burden on the plaintiff, who, under the TPPA, must actually "establish" elements of his claim instead of simply pleading his claims adequately to defeat a motion to dismiss pursuant to Rule 12(b)(6). The

11

TPPA, moreover, expressly acknowledges that parties may rely on affidavits, which Rule 12(b)(6) does not allow. *Compare* Tenn. Code Ann. § 20-17-105(d) ("The court may base its decision on supporting and opposing sworn affidavits stating admissible evidence upon which the liability or defense is based and on other admissible evidence presented by the parties.") *with* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). There is, in other words, "a 'direct collision' between the Federal Rule[s] and . . . state law," at least in terms of how the court should consider requests for dismissal filed immediately after the filing of a complaint. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749 (1980) (quoting *Hanna v. Plumer*, 380 U.S. 460, 469 (1965)). Indeed, this very case demonstrates that arguable collision. Martin has filed motions pursuant to Rule 12(b)(1) and Rule 12(b)(6)—which is what a person in his position *should* do under the Rules—but he has also filed a separate "petition" pursuant to the TPPA, which certainly seems, on its face, to be a means of circumventing the ordinary allocation of burdens imposed by Rule 12(b) and developed, in federal caselaw, over many years and countless incremental decisions.

Federal law is abundantly clear with regard to what must happen when a duly adopted Federal Rule of Civil Procedure collides with a state procedural edict in a federal court: the state requirement yields, and the Federal Rule prevails. *See, e.g.*, *ISpine, PLLC v. Allstate Prop. & Cas. Ins. Co.*, No. 19-CV-11458, 2020 WL 5769086, at *3 (E.D. Mich. Sept. 28, 2020) (discussing *Hanna*, 380 U.S. at 471 and subsequent cases). Judge Richardson of this court considered this principle in the context of another state's anti-SLAPP statute in *Lampo Grp., LLC v. Paffrath*, No. 3:18-CV-01402, 2019 WL 3305143 (M.D. Tenn. July 23, 2019), and concluded that, because "both the [anti-SLAPP statute] and [the] federal rules purport to answer the same question—the

applicable standard for granting pre-trial judgment to defendants in federal court"—then the state provision was "in direct conflict with the Federal Rules of Civil Procedure" and "cannot apply in federal court." *Id.* at *3. This court agrees with Judge Richardson's analysis and finds it equally compelling with regard to the TPPA. Admittedly, the TPPA, as Martin points out, is arguably *less* contrary to the Federal Rules of Civil Procedure than the California statute at issue in *Lampo* was—in that the standard pursuant to which a TPPA petition is to be evaluated is closer to, though still distinct from, the standard governing a Rule 12(b)(6) motion—but the determinative issue here is not the *degree* of the conflict between state and federal law but the *existence* of that conflict in the first place. If the court were to resolve the plaintiffs' claims pursuant to the procedures set forth in the TPPA, it would be adjudicating those claims in a manner not contemplated or authorized by the Federal Rules. The court will therefore deny Martin's petition by granting the plaintiffs' motion to strike that petition.

Martin protests that the court should not treat the TPPA as wholly pre-empted by the Federal Rules, because portions of the TPPA can be construed as setting forth substantive propositions of Tennessee law, particularly the substantive law of defamation and immunity for defamation. Insofar as Martin is correct on that front, the court will consider any such substantive rules, if necessary, in the context of considering his Rule 12(b)(6) motion. His reliance on the procedural framework imposed by the TPPA, however, is misplaced in this court, and the motion seeking to invoke that procedural framework must be stricken.

### C. Motion to Dismiss for Failure to State a Claim

#### 1. Defamation Claims

To establish a defamation claim under Tennessee law, a plaintiff must demonstrate that the defendant published a false and defamatory statement with knowledge of the statement's falsity,

reckless disregard for the statement's truth, or negligence in failing to ascertain the statement's truth. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999); *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978) (citing Restatement (Second) of Torts § 580B (1977)). The particular state of mind that is required to sustain a defamation claim varies depending on the identity of the parties involved. *See West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001). "[O]nly statements that are false are actionable," and, to establish any type of defamation claim, the plaintiff must prove that the defamation resulted in injury to his character and reputation. *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013).

Martin argues that the court should dismiss the plaintiffs' defamation claims because his statements on Facebook were non-defamatory as a matter of law. As Martin points out, "[a] published statement is not libelous because the subject of the publication finds it annoying, offensive or embarrassing. Rather, the statement must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule[] and convey an element of disgrace." *Grant v. Commercial Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *9 (Tenn. Ct. App. Sept. 18, 2015) (quoting *Aegis Scis. Corp. v. Zelenik*, No. M2012-00898-COA-R3CV, 2013 WL 175807, at *5 (Tenn. Ct. App. Jan. 16, 2013)) (internal quotation marks omitted). A negative statement about another person, moreover, is not defamatory merely because it was made out of "personal ill will, hatred, spite, or [a] desire to injure." *Hibdon v. Grabowski*, 195 S.W.3d 48, 63 (Tenn. Ct. App. 2005) (quoting *McWhorter v. Barre*, 132 S.W.3d 354, 365 (Tenn. Ct. App. 2003)). It is, therefore, not enough merely for Mucerino to assert that the Facebook post was uncharitable or that Martin intended to portray Mucerino negatively; Mucerino must plead facts plausibly showing a wrongful, meaningful threat to his actual reputation.

"The question of whether [a writing] was understood by its readers as defamatory is a question for the jury, but the preliminary determination of whether the [writing] is '*capable* of being so understood is a question of law to be determined by the court.'" *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 597 (6th Cir. 2013) (quoting *McWhorter v*, 132 S.W.3d at 364). In conducting that analysis, the court is permitted to—and indeed should—draw on a full, reasonable understanding of how human beings communicate, including an acknowledgment of the fact that some statements should be understood as employing "loose, figurative, [and/or] hyperbolic language which would negate the impression that the" statement should be construed as literally true. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990). At the same time, however, the court's acknowledgment of the ordinary norms and contingencies of communication does not always operate in the defendant's favor. While the court may, in one case, determine that literally false language was, in context, hyperbolic and non-defamatory, the same court might conclude, in a different case, that a "seemingly innocuous statement" is, in context, an instance of actionably defamatory innuendo. *Hunt v. Tangel*, No. 01A01-9705-CV-00199, 1997 WL 778989, at *3 (Tenn. Ct. App. Dec. 19, 1997).

When a court considers an allegedly defamatory statement, it should read the statement "as a person of ordinary intelligence would understand [it] in light of the surrounding circumstances." *Loftis v. Rayburn*, No. M2017-01502-COA-R3-CV, 2018 WL 1895842, at *5 (Tenn. Ct. App. Apr. 20, 2018) (quoting *Grant*, 2015 WL 5772524, at *10). Because the court is considering these issues in the context of Rule 12(b)(6), however, what matters is not the full *actual* context of the statements, but the context as plausibly alleged in the Complaint. That Complaint, the court notes, is unusually brief, consisting of just eight pages, half of which are devoted to setting out the specific civil counts and prayers for relief. The Complaint makes no meaningful effort to explain

15

the context of Martin's allegations or even what they are about—despite the fact that the plaintiffs' boilerplate assertions that the statements are false suggest that they know what Martin was referring to. Martin has provided a great deal of additional context, and the facts that he has provided would seemingly be appropriate for consideration under the TPPA procedural framework. Under the Rules of Civil Procedure, however, the court cannot consider those extraneous facts without converting Martin's motion into one for summary judgment—which, as the plaintiffs note, would then raise potentially serious issues regarding whether the plaintiffs have had a sufficient chance to engage in discovery and offer facts in rebuttal.[5] The court, accordingly, will consider only the Complaint, pursuant to Rule 12(b)(6), and will limit its analysis to consideration of the relatively few facts stated therein.[6]

By the court's reading, the Facebook post at the heart of this case suggested the following negative facts about Mucerino and/or Creekside Terrace: 1) that Camp Ravine, which they developed, has "many unresolved issues," which the Complaint does not identify; 2) that

---

[5] "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are [1] presented to and [2] not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). In other words, when a party filing or opposing a Rule 12(b)(6) or 12(c) motion brings up facts that are outside the four corners of the pleadings and not subject to either judicial notice or incorporation by reference into the pleadings, the court has two choices: it can ignore the non-pleaded facts on the ground that they are, by definition, irrelevant to the pending motion, which is confined to testing the pleadings; or, in the alternative, the court can consider some or all of the additional, non-pleaded facts, in which case the court is required to convert the motion to one for summary judgment under Rule 56. If the court chooses the second option, however, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). As long as a district court limits itself to one of the two options contemplated by Rule 12(d), the decision to convert or not to convert a motion is within that court's reasonable discretion. *See Miller v. Mearns*, 643 F. App'x 552, 554 (6th Cir. 2016) (citing *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010)).

[6] The court notes that, regardless of the disposition of the current motions, there may have been reasonable strategic considerations that favored such a short Complaint. Although the lack of more contextual information may work against the plaintiffs in some ways, it is noteworthy that it is Martin, not the plaintiffs, who actually wishes to expand the facts under consideration, because, as Martin's briefing demonstrates, the full context of this situation arguably reveals additional viable defenses. The court notes the length of the Complaint merely to highlight what the court does and does not have to work with.

16

Mucerino, as the developer, is "responsible for" those "issues"; 3) that he had "no plans to fix" the "issues"; and 4) that there was some meaningful possibility that Mucerino would "claim[] bankruptcy" if Camp Ravine's residents sought money damages. Although Martin has provided some information regarding what those "issues" were—they apparently involve matters related to drainage, erosion, and/or sidewalks—all that matters at this stage is what the Complaint itself states. That Complaint contains no meaningful information regarding what the "issues" cited were or how a short, vague Facebook post about those "issues" could harm Mucerino's reputation, let alone harm it enough to actually injure him economically, as he claims.

Every neighborhood has issues. There is, moreover, nothing remarkable about the fact that some of a neighborhood's issues might be attributable to a neighborhood's developer. Developing a neighborhood involves tradeoffs, including, potentially, tradeoffs between costs and amenities. Whether a particular feature of a neighborhood is a problem and whether the developer should be faulted for his decisions regarding that feature are, at least in significant part, questions of opinion, unless the developer has failed to live up to contractual obligations—which the Facebook post in question here does not actually assert. While there is, as the plaintiffs point out, no categorical bar to premising liability on a statement with an opinion component, the opinion-based nature of a statement does render that statement less likely to have a defamatory impact. *See Milkovich*, 497 U.S. at 21 (discussing issues related to supporting a claim for defamation based on a statement of opinion). This court finds that particularly true where, as here, the text of the statement at issue makes clear that it is alluding to underlying facts that would require additional investigation to understand. Any reasonable reader of Martin's Facebook post would note its lack of specific allegations and understand that he was reading merely Martin's characterization of a possibly complex, underlying situation that might be subject to other interpretations.

17

The Complaint's cursory recitation of the facts—little more, in essence, than allowing the Facebook post to speak for itself—is simply not sufficient to state a claim for defamation under Rule 8 of the Federal Rules of Civil Procedure. Based on the facts set forth in the Complaint, a member of the public who saw Martin's Facebook post would know only the unremarkable fact that some residents of Camp Ravine were unhappy for undisclosed reasons and were considering litigation but had concerns that Mucerino might, as developers sometimes do, resort to bankruptcy if faced with large civil liabilities. It is understandable that Mucerino would be unhappy with such a message and believe that it was unfair. The tort of defamation, however, does not exist to transform every bit of public interpersonal unfairness into a court case. Defamation exists only to address the narrow set of situations in which a false statement "constitute[s] a serious threat to the plaintiff's reputation." *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001) (quoting *Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983)). The Complaint simply fails to plausibly describe such a situation here. What it describes, rather, is simply ordinary griping that comes with the territory of residential property development.

In the plaintiffs' Response, they point out that there is a history, in Tennessee law, of treating assertions of a plaintiff's insolvency as having a defamatory meaning *per se. See, e.g., Cont'l Nat. Bank v. Bowdre*, 23 S.W. 131, 134 (Tenn. 1893) ("Of merchants, tradesmen, and others in occupations where credit is essential to successful prosecution, any language is actionable, without proof of special damages, which imputes a want of credit or responsibility, or suggests a charge of insolvency.") (citation omitted). Even the plaintiffs themselves admit, however, that Tennessee has long since abolished any such presumption. (*See* Doc. No. 30 at 4 n.3 (admitting that the plaintiffs "no longer enjoy the presumption of injury" associated with suggestions of insolvency). Indeed, the caselaw on which the presumption was based has not merely been

superseded but, in the words of the Tennessee Supreme Court, "no longer has any practical meaning" at all. *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978). The Tennessee Supreme Court even approvingly quoted scholarly criticism of the *per se* defamation framework as based on "often illogical distinctions, most of them relics from centuries past." *Id.* (citations omitted). Statements regarding insolvency are now, like all other statements, subject to the "uniform requirement" that their defamatory nature actually be supported by facts. *Id.* (citations omitted).

In any event, the Facebook post does not suggest that Mucerino or Creekside Terrace *is* insolvent or will imminently be so; it suggests, instead, that Mucerino might ultimately escape satisfaction of a judgment through a future bankruptcy—which is, of course, something that happens fairly often, as unfortunate as that may be for plaintiffs and creditors. Indeed, even a company with exemplary financial health can be driven to the bankruptcy process by litigation, particularly if the claims are big enough and the company small enough. Expressing concern for that future possibility is not the same thing as suggesting that a company is presently in financial distress.

Characterizing Martin's statements as defamation by implication does not solve the Complaint's problems. The court has already considered the contents of the Facebook post in the context of the most damning implications that one could draw from it, particularly with regard to the reference to bankruptcy. The plaintiffs are correct that the post implied more than it explicitly asserted, but even those implications, like the literal content of the message, are simply too vague and unremarkable to give rise to liability. The idea that a developer facing lawsuits might file for bankruptcy is hardly shocking; indeed, such considerations come into play in many instances of contemplated litigation, including, in particular, litigation against small businesses in fields with

19

significant downside risks, like property development. Without some greater explanation of why the Facebook post posed a serious threat to the plaintiffs' reputations, neither its express content nor its implication is actionable.

### 2. False Light Invasion of Privacy

Tennessee recognizes the claim of false light invasion of privacy to protect the rights of plaintiffs who "have had attributed to them certain qualities, characteristics, or beliefs that, while not injurious to their reputation, place those persons in an undesirable light." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001). In Tennessee, a false light claim requires that the defendant gave publicity to the plaintiff that places the plaintiff in a false light, that the false light is highly offensive to a reasonable person (as determined objectively), and that the defendant acted with knowledge or reckless disregard for the falsity of the publicized matter (as determined subjectively). *Id.* at 643–44 (quoting the Restatement (Second) of Torts (1977), § 625E).

Although a claim for false light invasion of privacy is separate and distinct from a claim for defamation, Tennessee courts, "[i]n recognition of the kinship between" the two types of claim, have often "defined the contours of the tort of false light with reference to the Tennessee law on defamation." *Gallagher v. E.W. Scripps Co.*, No. 08-2153-STA, 2009 WL 1505649, at *7 (W.D. Tenn. May 28, 2009) (citing *West*, 53 S.W.3d at 645–49). That kinship is apparent here, in that the vague nature of the Facebook post and the lack of any extenuating context—which proved fatal to the plaintiffs' claims for defamation—also support dismissal of the plaintiffs' claims for false light invasion of privacy. The Facebook post depicts a garden-variety dispute between residents and a developer and notably omits any details that might amount to accusing Mucerino of particular wrongdoing or breach of any contractual obligations. The only message that a member of the

general public could take from the post was that some Camp Ravine residents were unhappy with Mucerino about *something* and were considering either a lawsuit or entreaties to "city hall" about the situation. There is nothing in the post that could plausibly be considered—under an objective, reasonable-person standard—to be "highly offensive." The court therefore will dismiss the claims for false light invasion of privacy.

### III. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion to Strike (Doc. No. 18) will be granted and Martin's Petition to Dismiss Pursuant to the Tennessee Public Participation Act (Doc. No. 13) will be denied. Martin's Rule 12(b)(1) Motion to Dismiss (Doc. No. 21) will also be denied, but his Rule 12(b)(6) Motion to Dismiss (Doc. No. 23) will be granted in full, and the claims will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge